Slip Op. 14- 24

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE TIMKEN COMPANY, | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Judge |
| UNITED STATES, | Consol. Court No. 12-00415 |
| Defendant, | |
| NTN BEARING CORPORATION OF AMERICA, NTN-SNR ROULEMENTS S.A., SNR BEARINGS USA, INC., MYONIC GMBH, NEW HAMPSHIRE BALL BEARINGS, INC., SCHAEFFLER ITALIA S.R.L, SKF USA, INC., SKF INDUSTRIES S.P.A., and SOMECAT S.P.A., | |
| Defendant-Intervenors. | |

## OPINION

[Commerce's final results in antidumping duty review declining to apply a targeted dumping remedy sustained.]

Dated: February 27, 2014

Geert M. De Prest, Stewart and Stewart, of Washington, DC, argued for plaintiff. With him on the brief were Terence P. Stewart and Lane S. Hurewitz.

Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Whitney M. Rolig, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Diane A. MacDonald, Baker & McKenzie, LLP, of Chicago, IL, argued for defendant-intervenors NTN Bearing Corporation of America, NTN-SNR Roulements, S.A., and

SNR Bearings USA, Inc.  With her on the brief was Kevin M. O'Brien.

John M. Foote, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for defendant-intervenor Schaeffler Italia S.r.l.  With him on the brief were Max F. Schutzman and Andrew T. Schutz.

Herbert C. Shelley, Steptoe & Johnson LLP, of Washington, DC, argued for defendant-intervenors SKF USA Inc., SKF Industrie S.p.A., and Somecat S.p.A.  With him on the brief were Michael T. Gershberg, Laura R. Ardito, and Christopher G. Falcone.

Jay C. Campbell and Walter J. Spak, White & Case, LLP, of Washington, DC, for defendant-intervenors myonic GmbH and New Hampshire Ball Bearings, Inc.

Restani, Judge: This matter is before the court on plaintiff The Timken Company's ("Timken") motion for judgment on the agency record pursuant to USCIT Rule 56.2. Timken challenges various aspects of the U.S. Department of Commerce's ("Commerce") final results rendered in the 2010–2011 review of the antidumping duty orders on ball bearings and parts thereof from France, Germany, and Italy.  Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011, 77 Fed. Reg. 73,415 (Dep't Commerce Dec. 10, 2012) ("Final Results").  For the reasons stated below, the court sustains the Final Results.

## BACKGROUND

This case requires the court to resolve issues regarding Commerce's analysis of Timken's "targeted dumping" allegations against NTN-SNR Roulements S.A. ("NTN-SNR"), myonic GmbH ("myonic"), SKF Italy ("SKF"), and Schaeffler Italia S.r.l. ("Schaeffler") (collectively "the respondents").  Because the advent of "targeted dumping" allegations in administrative reviews is a recent development, it is necessary to provide some background on the statutory and regulatory framework regarding targeted dumping before addressing Timken's specific arguments in this case.

Until 2012, Commerce's default methodology for comparing home market and export prices in administrative reviews had been the average-to-transaction ("A-T") methodology.  See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012) ("Final Modification").  When applying this methodology, Commerce did not allow transactions with export prices above the home market price to offset transactions with export prices below the home market price.  Id.  The disallowance of offsets is commonly referred to as "zeroing."[1]  On February 14, 2012, Commerce announced that it was changing its default comparison methodology in administrative reviews to the average-to-average ("A-A") methodology with offsets in order to comply with World Trade Organization ("WTO") decisions finding the use of zeroing in administrative reviews inconsistent with the United States' WTO obligations.  Id.  According to Commerce, this change meant that the default methodology in reviews essentially would mirror its WTO-compliant methodology in antidumping investigations.  Id.  Commerce, however, stated that it would consider the use of other comparison methodologies if the circumstances warranted and that it would examine the same criteria it examines in investigations to determine if another comparison methodology would be more appropriate.  Id. at 8102.  Commerce did not rule out the possibility of using a zeroing methodology if it found such circumstances.  See id. at 8104, 8106–07.

As explained above, the default comparison methodology in investigations is the

---

[1] For a detailed explanation of the zeroing practice and its history, see Union Steel v. United States, 823 F. Supp. 2d 1346 (CIT 2012).

A-A methodology.  See also 19 U.S.C. § 1677f-1(d)(1)(A) (2006).[2]  The antidumping statute

specifies that in an investigation, however, the A-T methodology may be used if there is

"targeted dumping."  Specifically, 19 U.S.C. § 1677f-1(d)(1)(B) provides:

> The administering authority may determine whether the subject merchandise is being
> sold in the United States at less than fair value by comparing the weighted average
> of the normal values to the export prices (or constructed export prices) of individual
> transactions for comparable merchandise, if—
>> (i)  there is a pattern of export prices (or constructed export prices) for
>> comparable merchandise that differ significantly among purchasers, regions,
>> or periods of time, and
>> (ii) the administering authority explains why such differences cannot be
>> taken into account using [the A-A methodology or the T-T methodology].

The "pattern of export prices (or constructed export prices) for comparable merchandise that

differ significantly among purchasers, regions, or periods of time" is what is referred to as

"targeted dumping."  If Commerce finds targeted dumping and explains why the default A-A

methodology cannot take account of the pattern, Commerce may use the A-T methodology to

compare the home market and export prices.  Commerce has used this statutory provision as

guidance in deciding when to apply the A-T methodology (likely with zeroing) instead of the

default A-A methodology in reviews.  See, e.g., Issues and Decision Memorandum for the Final

Results of the Antidumping Duty Administrative Review: Circular Welded Carbon Steel Pipes

and Tubes from Turkey—May 1, 2010, through April 30, 2011, A-489-501, at 10 (Nov. 30,

2012), available at http://enforcement.trade.gov/frn/summary/turkey/2012-29529-1.pdf (last

visited Feb. 20, 2014); Issues and Decision Memorandum for the Antidumping Duty

---

[2] Although the transaction-to-transaction ("T-T") methodology also is listed as a
preferred methodology, Commerce, for practical reasons, rarely employs this methodology.  See
19 C.F.R. § 351.414(c)(2) (2013) ("The Secretary will use the transaction-to-transaction
method only in unusual situations, such as when there are very few sales of subject merchandise and the
merchandise sold in each market is identical or very similar or is custom-made.").

Administrative Reviews of Ball Bearings and Parts Thereof from France, Germany, and Italy;

2010-2011, A-427-801, A-428-801, A-475-801, at 11–12 (Dec. 4, 2012) ("I&D Memo"),

available at http://enforcement.trade.gov/frn/summary/MULTIPLE/2012-29770-1.pdf (last

visited Feb. 20, 2014).

      Relevant to this case, Commerce has applied the so-called Nails[3] test to determine

whether targeted dumping has occurred.  The Nails test proceeds in two stages, each done on a

product-specific basis (by control number or CONNUM).  The first stage is referred to as the

"standard-deviation" test.  I&D Memo at 13.  If 33% or more of the alleged targeted group's

(i.e., customer, region, or time period) sales of subject merchandise are at prices more than one

standard deviation below the weighted-average price of all sales under review, those sales pass

the standard deviation test and are considered in step two—the "gap" test.  Id.  In performing the

gap test, Commerce considers whether the "gap" between the weighted-average sales price to the

targeted group and the weighted-average sales price to the next-highest non-targeted group is

---

    [3] The Nails test derives its name from the cases in which it was first used.  See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008); Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008).  Commerce may be applying an entirely different test in future reviews.  See, e.g., Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Fifth Antidumping Duty Administrative Review, A-570-904, at 21–22 (Nov. 20, 2013), available at http://enforcement.trade.gov/frn/summary/prc/2013-28359-1.pdf (last visited Feb. 20, 2014); Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2011–2012, A-489-501, at 38–39 (Dec. 23, 2012), available at http://enforcement.trade.gov/frn/summary/turkey/2013-31344-1.pdf (last visited Feb. 20, 2014).  The court expresses no opinion on a test that was not employed in this case.

greater than the average gap between the non-targeted groups.  Id.  If the gap between the

targeted group and the next-highest non-targeted group is greater than the average gap, those

sales pass the gap test.  Id.  If more than 5% of total sales of the subject merchandise to the

alleged target pass both tests, Commerce determines that targeting has occurred.  Id.

   Turning to the facts of the case at bar, this case arises out of Commerce's

2010–2011 review of antidumping duty orders on ball bearings and parts thereof from France,

Germany, and Italy.  Final Results, 77 Fed. Reg. at 73,415.  While the reviews were proceeding,

Commerce announced its change in default methodology for reviews.  See Timken's Targeted

Dumping Analysis for NTN-SNR at 1–2, A-427-801, PD 85 at bar code 3057972-01 (Feb. 21,

2012), ECF No. 47-2 (June 14, 2013).  Timken, the petitioner before the agency, in anticipation

of the possible application of the modified methodology to the reviews at bar, filed allegations of

targeted dumping with Commerce against the respondents on February 21, 2012.[4]  See, e.g., id.

at 1–4.

   Commerce's preliminary results did not rule on the targeted dumping allegation

and applied the default A-A methodology, which resulted in zero dumping margins for each of

the respondents.  Ball Bearings and Parts Thereof From France, Germany, and Italy: Preliminary

Results of Antidumping Duty Administrative Reviews and Rescission of Antidumping Duty

Administrative Reviews in Part, 77 Fed. Reg. 33,159, 33,161, 33,164 (Dep't Commerce June 5,

2012).  Commerce, however, invited the parties to comment on the targeted dumping allegations

---

  [4] Timken had filed similar allegations in November 2011, before Commerce's change in
methodology was finalized.  See I&D Memo at 5.

and the use of the new default methodology. Id. at 33,161–62.

   Commerce issued post-preliminary determinations addressing the targeted

dumping allegations on October 16, 2012. Post-Preliminary Analysis and Calculation

Memorandum, A-427-801, PD 109 at bar code 3101431-01 (Oct. 16, 2012), ECF No. 47-2 (June

14, 2013) ("Post-Preliminary Results"). In its analysis, Commerce applied the Nails test to

determine whether targeted dumping had occurred. See id. at 2–3. Commerce found sales that

passed both stages of the Nails test for each respondent. Id. at 3; Timken's Comments on the

Post-Preliminary Targeted Dumping Analysis for NTN-SNR at 2, A-427-801, PD 120 at bar

code 3104304-01 (Nov. 5, 2012), ECF. No. 47-2 (June 14, 2013) ("Timken's Post-Preliminary

Comments for NTN-SNR"). In these reviews, Commerce compared the number of sales that

passed the Nails test to all U.S. sales for each respondent. See Post-Preliminary Results Analysis

for NTN-SNR at 2, A-427-801, PD 110 at bar code 3101689-01 (Oct. 16, 2012), ECF No. 47-2

(June 14, 2013) ("Post-Preliminary Analysis for NTN-SNR"); Post-Preliminary Results Analysis

for myonic GmbH at 2, A-428-801, PD 89 at bar code 3101703-01 (Oct. 16, 2012), ECF No. 47-

3 (June 14, 2013) ("Post-Preliminary Analysis for myonic"); Post-Preliminary Results Analysis

for Schaeffler at 2, A-475-801, PD 151 at bar code 3101554-01 (Oct. 16, 2012), ECF No. 47-3

(June 14, 2013) ("Post-Preliminary Analysis for Schaeffler"); Post-Preliminary Results Analysis

for SKF at 2, A-475-801, PD 155 at bar code 3101698-01 (Oct. 16, 2012), ECF No. 47-3 (June

14, 2013) ("Post-Preliminary Analysis for SKF"). For each respondent, Commerce determined

that the volume and value of sales that passed the Nails test was insufficient as a percentage of

the volume and value of all U.S. sales to warrant the use of the alternative A-T methodology.

See Post-Preliminary Analysis for NTN-SNR at 2; Post-Preliminary Analysis for myonic at 2;

<u>Post-Preliminary Analysis for Schaeffler</u> at 2; <u>Post-Preliminary Analysis for SKF</u> at 2.

Timken filed comments with Commerce challenging Commerce's decision to engage in this additional step beyond the two-part <u>Nails</u> test and Commerce's use of only the sales that passed the <u>Nails</u> test to determine the significance of the targeted dumping.  <u>See, e.g.,</u> <u>Timken's Post-Preliminary Comments for NTN-SNR</u>.  Following comments by the parties and a hearing, Commerce issued its final results.  <u>Final Results</u>, 77 Fed. Reg. at 73,415.  Commerce again determined that the volume and value of targeted sales for each respondent was insufficient to consider using the A-T methodology.  <u>See</u> <u>I&D Memo</u> at 10, 12–15.  Commerce therefore applied the default A-A methodology and again found dumping margins of zero for each respondent.  <u>See</u> <u>I&D Memo</u> at 10; <u>Final</u> <u>Results</u>, 77 Fed. Reg. at 73,416.  Timken challenges Commerce's analysis of its targeted dumping allegations on several grounds, each of which will be discussed below.  Defendant-intervenors argue that Commerce's determination should be sustained.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.      Consistency with Past Practice

The bulk of Timken's argument is that Commerce's decision to compare the results of the <u>Nails</u> test to total sales before considering the use of the A-T methodology is

inconsistent with Commerce's past practice in applying the <u>Nails</u> test.  <u>See</u> Timken Co.'s Mem.

in Supp. of Its Rule 56.2 Mot. for J. on the Agency R., ECF No. 46, 16–33 ("Timken Br.").

According to Timken, once Commerce had found sales that passed the <u>Nails</u> test, in prior cases it

automatically considered whether the use of the A-T methodology was appropriate by comparing

the dumping margins calculated using the A-A methodology to the margins calculated using the

A-T methodology.  <u>Id.</u> at 17–19.  Timken alleges that Commerce had explicitly declined in four

other cases to engage in a de minimis inquiry in determining whether a pattern exists for

purposes of 19 U.S.C. § 1677f-1(d)(1)(B).[5]  <u>Id.</u> at 18–22 (citing Issues and Decision

Memorandum for the Final Determination in the Antidumping Duty Investigation of

Multilayered Wood Flooring from the People's Republic of China, A-570-970 (Oct. 11, 2011)

("<u>Wood Flooring from China</u>"), <u>available at</u>

http://enforcement.trade.gov/frn/summary/prc/2011-26932-1.pdf (last visited Feb. 20, 2014);

Issues and Decision Memorandum for the Less than Fair Value Investigation of Certain Steel

Nails from the United Arab Emirates, A-520-804 (Mar. 19, 2012) ("<u>Nails from the UAE II</u>"),

<u>available at</u> http://enforcement.trade.gov/frn/summary/uae/2012-7067-1.pdf (last visited Feb. 20,

2014); High Pressure Steel Cylinders from the People's Republic of China: Issues and Decision

Memorandum for the Final Determination, A-570-977 (Apr. 30, 2012) ("<u>Steel Cylinders from</u>

<u>China</u>"), <u>available at</u> http://enforcement.trade.gov/frn/summary/prc/2012-10952-1.pdf (last

---

[5] Timken and several of the defendant-intervenors refer to Commerce's sufficiency determination as a de minimis test.  <u>See, e.g.</u>, Timken Br. 34–35; Resp. of NTN Bearing Corp. of Am., et al., to the Rule 56.2 Mots. of the Timken Co., ECF No. 57, 13.  The government denies that Commerce created a de minimis test.  Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 59, 12.  Because of this disagreement regarding the use of the term "de minimis," the court will refer to Commerce's determination as a sufficiency determination.

visited Feb. 20, 2014); Issues and Decision Memorandum for the Antidumping Duty

Investigation of Large Residential Washers from the Republic of Korea, A-580-868 (Dec. 18,

2012) ("Washers from Korea"), available at

http://enforcement.trade.gov/frn/summary/korea-south/2012-31104-1.pdf (last visited Feb. 20,

2014)).  Because Commerce allegedly failed to provide a proper explanation for this change in

practice, Timken argues that remand is necessary.  Id. at 22–33.

          The government argues that Commerce's decision in this case is consistent with

its prior reasoning.  See Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No.

59, 12–16 ("Government Br.").  Commerce cited a prior case in which it engaged in a similar

sufficiency analysis even after some sales had passed the Nails test.  I&D Memo at 13–14 (citing

Certain Stilbenic Optical Brightening Agents From Taiwan: Preliminary Determination of Sales

at Less than Fair Value and Postponement of Final Determination, 76 Fed. Reg. 68,154, 68,156

(Dep't Commerce Nov. 3, 2011) ("OBAs from Taiwan")).  Commerce noted that it had

previously indicated that it would proceed on a case-by-case basis in determining when to use

the A-T methodology and explained that its prior cases did not preclude the analysis undertaken

here.  See id. at 11, 13–15.  Commerce further noted that 19 U.S.C. § 1677f-1(d)(1)(B) states

that Commerce "may" use the A-T methodology if it finds targeted dumping, but it is not

required to do so.  Id. at 14.  The government argues that Commerce's determination was a

reasonable exercise of its discretion and otherwise in accordance with law.  Government Br.

16–19.

          SKF argues that Commerce had no duty to explain any departure from the cases

cited by Timken.  See Resp. Br. of SKF USA Inc., SKF Industrie S.p.A., and Somecat S.p.A.

Opposing the Rule 56.2 Mot. of the Timken Co., ECF No. 53, 9–15 ("SKF Br."). SKF notes that

the cases cited by Timken were all investigations, whereas this case involves a review. Id. at

10–11. SKF argues that to the extent that Commerce's practice in investigations might be

relevant, three prior decisions[6] do not reflect a well-established practice from which a departure

must be explained. Id. at 12–14. SKF additionally argues that because Commerce's practice

with regard to targeted dumping was in a state of flux and Commerce had stated that it intended

to proceed on a case-by-case basis in this area, there could be no presumption of continuity. Id.

at 14–15.

Schaeffler claims that Timken's arguments based on past practice fail to

recognize Commerce's ability to adapt and change its practices and argues that the alleged

change here was a relatively minor evolution from previous cases. Resp. of Def.-Intervenor

Schaeffler Italia S.r.l. to Pl.'s Mem. in Supp. of Its Rule 56.2 Mot., ECF No. 54, 12–14

("Schaeffler Br."). NTN-SNR, citing OBAs from Taiwan, argues that Commerce's decision is in

line with past practice. Resp. of NTN Bearing Corp. of Am., et al., to the Rule 56.2 Mots. of the

Timken Co., ECF No. 57, 13 ("NTN-SNR Br.").[7]

---

[6] The final determination in one of the four cases cited by Timken, Washers from Korea, was published in the Federal Register approximately two weeks after Commerce's final determination in the challenged reviews. Compare Final Results, 77 Fed. Reg. at 73,415 (dated December 10, 2012), with Notice of Final Determination of Sales at Less than Fair Value: Large Residential Washers From the Republic of Korea, 77 Fed. Reg. 75,988 (Dep't Commerce Dec. 26, 2012).

[7] NTN-SNR also argues that the results ultimately should be affirmed because Commerce lacked the authority to engage in the targeted dumping analysis at all. See NTN-SNR Br. 3–11. NTN-SNR first argues that 19 U.S.C. § 1677f-1(d) limits the targeted dumping analysis to investigations. Id. at 3–9. NTN-SNR claims that because the targeted dumping inquiry is described only in the subsection entitled "Investigations" and is absent in the subsection entitled

(continued...)

      The court notes that Commerce's inconsistency in its explanations has generated

quite a bit of confusion that is reflected in the briefing of this case.  Much of the briefing in this

---

[7](...continued)
"Reviews," Congress clearly intended for the targeted dumping analysis to be limited to investigations.  Id.  NTN-SNR also argues that Commerce's targeted dumping analysis was based on improperly submitted information, in that Timken first filed targeted dumping allegations in November 2011, several months before Commerce's February 2012 Final Modification announcing the change in default methodology for reviews.  Id. at 9–11. NTN-SNR requests that the court reverse Commerce's determination that it may conduct a targeted dumping analysis in a review and order that Timken's targeted dumping allegations be removed from the record.  Id. at 15.

      Even assuming that NTN-SNR may succeed on an argument contrary to that advanced by the agency to support the outcome reflected in the Final Results, see SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."), the court finds these arguments unpersuasive.  Turning to NTN-SNR's first argument, 19 U.S.C. § 1677f-1(d)(2), the subsection entitled "Reviews," does nothing more than clarify how Commerce should proceed when it decides to use the A-T methodology (namely, that it should use monthly averages). Section 1677f-1(d)(2) is otherwise completely silent as to how Commerce should conduct its determination of less than fair value in reviews, leaving Commerce substantial discretion as to the methodologies it wishes to employ.  See Union Steel v. United States, 823 F. Supp. 2d 1346, 1359–60 (CIT 2012), aff'd, 713 F.3d 1101 (Fed. Cir. 2013).  NTN-SNR's reliance on FAG Italia S.p.A. v. United States, 291 F.3d 806 (Fed. Cir. 2002), is misplaced.  In that case, the Court of Appeals for the Federal Circuit ("Federal Circuit") determined that 19 U.S.C. § 1675(a)(4), which authorizes Commerce to make a duty absorption inquiry in the second and fourth administrative reviews of orders entered after the Uruguay Round Agreements Act (URAA) came into effect, did not authorize Commerce to make a similar determination in other years or in reviews of orders entered before the URAA came into effect.  Id. at 818–19.  The Federal Circuit stressed, however, that Commerce lacked a general authority to act that would have authorized Commerce to engage in the disputed inquiry despite the limited scope of 19 U.S.C. § 1675(a)(4).  Id. at 818 n.18.  Commerce certainly has a general authority to conduct an administrative review, and NTN-SNR has failed to put forward any limitation on that authority except for its reference to § 1677f-1(d).  As explained above, that section does nothing more than clarify that the averaging period in reviews should be monthly.  It places no other limits on the methodologies that Commerce may employ in reviews, leaving Commerce discretion as to the choice of methodologies.

      In the light of this broad discretion, Commerce acted reasonably and did not abuse its discretion by basing its practice in reviews on its practice in investigations, which includes the use of the targeted dumping analysis.  The court rejects NTN-SNR's second argument because Commerce ultimately based its analysis on Timken's renewed targeting allegations, which were submitted after Commerce had published its Final Modification.  See I&D Memo at 15.

case treated Commerce's sufficiency determination as part of finding the requisite pattern in 19

U.S.C. § 1677f-1(d)(1)(B).  This is understandable because Commerce made statements in the

record indicating that this was the basis for continuing to use the A-A methodology.  See, e.g.,

Post-Preliminary Analysis for NTN-SNR at 2; I&D Memo at 10 ("We continue to find, for each

respondent, that a pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or time periods does not

exist . . . .").  Other parts of the record, however, indicate that Commerce found a pattern of

significant differences, but did not find the pattern sufficient to invoke its discretionary authority.

See, e.g., Post-Preliminary Results at 3 ("The Department preliminarily finds, for each

respondent, that the pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or time periods is insufficient to

consider whether the standard comparison method can account for the alleged targeted

dumping."); I&D Memo at 13 (stating that Commerce determines that targeting has occurred

once sales have passed both prongs of the Nails test); id. at 14 (noting that § 1677f-1(d)(1)(B)'s

inclusion of the word "may" indicates that Commerce is not required to use the A-T

methodology even if both prongs of the Nails test are satisfied).  The government clarified at oral

argument and in its supplemental briefing that the Nails test finds the requisite pattern and that

Commerce's sufficiency determination was made pursuant to its discretionary authority granted

by the word "may" in § 1677f-1(d)(1)(B).  See Def.'s Supplemental Filing Responding to the

Ct.'s Questions Regarding Targeted Dumping, ECF No. 81, 7 ("Government Supplemental

Br.").  Because the government's position is rooted in statements made by Commerce on the

record, the court will treat the sufficiency determination as part of Commerce's exercise of its

discretionary authority based on the word "may."  See Ceramica Regiomontana, S.A. v. United

States, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may uphold an agency's decision of less

than ideal clarity if the agency's path may reasonably be discerned." (internal quotation marks

and brackets omitted)).

      Treating the sufficiency determination in this case as rooted in Commerce's

discretionary authority, the court finds little, if any, inconsistency with the cases cited by

Timken. First, the language cited by Timken from Wood Flooring from China appears to be

directed at the issue of whether the A-T methodology should be applied to all sales or only

targeted sales.  See Wood Flooring from China at 32–33.  Commerce's reasoning for applying

the A-T remedy to all sales is distinct from the issue of whether Commerce should consider the

use of the A-T methodology at all.

      The language in Nails from the UAE II likewise is not instructive as to how

Commerce should exercise its discretion.  In that case, Commerce explained:

> In calculating margins, pursuant to section 777A(d)(1)(B)(i) of the Act the
> Department may use the A-T comparison methodology if "there is a pattern of export
> prices . . . for comparable merchandise that differ significantly among purchasers,
> regions, or periods of time."  This statutory language does not establish how a pattern
> of prices should be measured in terms of the prevalence of underlying sales in
> relation to all sales.  Instead, the statute states that there must be a variance in export
> prices among purchasers, regions, or periods of time, and that the variance must
> exhibit a pattern.  Thus, the task of finding a pattern involves determining the
> frequency of low prices in a given group of sales, and not whether the sales in that
> group were frequent in relation to all sales. . . .
>
> Dubai Wire and Precision did not demonstrate why the prices for products
> corresponding to a small percentage of overall sales cannot be found to exhibit a
> pattern under the statute.  We find that the methodology underlying our targeted
> dumping test in identifying a pattern of prices pursuant to section 777A(d)(1)(B)(i)
> of the Act is  reasonable.   As indicated correctly by interested parties, this
> methodology has also withstood judicial scrutiny.  Lastly, the targeted sales are not
> likely to account for a significant portion of sales because, by definition, targeting

is an act of selectively pursuing a specific market segment or product.

Nails from the UAE II at 14–15 (emphases added) (citation omitted).  This language clearly

deals with whether the statutory definition of "pattern" has been met.  As explained above,

however, Commerce found a pattern using the Nails test, but Commerce exercised its discretion

because the pattern was not sufficient to warrant considering or applying the A-T methodology.

The language from Nails from the UAE II does not address Commerce's use of that discretion.

         Similarly, the language in Steel Cylinders from China addresses the definition of

"pattern" as that term is used in 19 U.S.C. § 1677f-1(d)(1)(B).  Steel Cylinders from China at 31

("This statutory language does not establish how a pattern of prices should be measured in terms

of the prevalence of underlying sales in relation to all sales.  Instead, the statute states that there

must be a pattern of prices that differ among purchasers, regions, or periods of time, and that the

difference must be significant.  Thus, the task of finding a pattern under the Nails test involves

determining the frequency of low prices in a given group of sales, and not whether the sales in

that group were frequent in relation to all sales." (emphases added)).

         The language cited by Timken in Washers from Korea, which was published after

the Final Results in this case, is even less helpful to Timken.  Again the language focused on by

Timken deals with the pattern requirement.  See Washers from Korea at 22–23 ("As we stated in

UAE Nails II, the statutory language of section 777A(d)(1)(B)(i) of the Act does not establish

how a pattern of prices should be measured in terms of the prevalence of underlying sales in

relation to all sales.  Instead, the statute states that there must be a variance in export prices

among purchasers, regions, or periods of time, and that the variance must exhibit a pattern."

(emphasis added)).  But Commerce also stated: "If we determined that a sufficient volume of

U.S. sales were found to have passed the <u>Nails</u> test, then the Department considered whether the average-to-average method could take into account the observed price differences." <u>Id.</u> at 20. Commerce further explained:

> With respect to the respondents' contention that the Department should apply a <u>de minimis</u> threshold before invoking the average-to-transaction method, we note that the Department has also addressed this argument in previous cases. As we discussed above, we considered the volume of U.S. sales that passed the <u>Nails</u> test. However, the Department does not employ a de minimis threshold but rather makes its determination on a case-by-case basis.

<u>Id.</u> at 22 (citation omitted). These latter statements are entirely consistent with Commerce's methodology and analysis in this case.

Commerce also cited <u>OBAs from Taiwan</u> as a prior case in which it conducted an additional test beyond the <u>Nails</u> test before considering the use of the A-T methodology. <u>I&D Memo</u> at 14. In that case, Commerce determined that the number of sales that passed the <u>Nails</u> test "was insufficient to establish a pattern of export prices for comparable merchandise that differ significantly among certain customers or regions." <u>OBAs from Taiwan</u>, 77 Fed. Reg. at 17,028. Although this is framed as part of the pattern inquiry and Commerce justifies its actions in this case on the word "may," <u>OBAs from Taiwan</u> lends support to Commerce's assertion that it previously had considered the number of sales that passed the <u>Nails</u> test before considering whether the A-T methodology was appropriate.

The cases supposedly supporting Timken's argument (<u>Wood Flooring From China</u>, <u>Nails from the UAE II</u>, and <u>Steel Cylinders from China</u>) thus are mostly, if not entirely, irrelevant to the issue in this case because they address different aspects of the targeted dumping analysis. One case cited by Timken (<u>Washers from Korea</u>) even contains the same analysis that Commerce engaged in during this case, and Commerce pointed to a case (<u>OBAs from Taiwan</u>) in

which Commerce engaged in a similar analysis as part of the pattern inquiry.  Based on these

cases, the court is unable to agree with Timken that Commerce's actions were precluded by its

prior cases.

    To the extent that some of the reasoning in the discussed cases might be construed

as inconsistent with Commerce's actions in this case, the court finds such minor inconsistency

insufficient to conclude that Commerce abused the discretion granted to it in selecting an

alternative methodology.  The statute used by Commerce for guidance in conducting a targeted

dumping analysis in reviews states that Commerce "may" use the A-T methodology if the

statutory criteria are met.  19 U.S.C. § 1677f-1(d)(1)(B).  And Commerce stated in the <u>Final</u>

<u>Modification</u> that it would "determine on a case-by-case basis whether it is appropriate to use an

alternative comparison methodology" in reviews.  77 Fed. Reg. at 8102.  "When making a

discretionary determination, . . . Commerce can use a case-by-case analysis, so long as it is

consistent with its statutory authority."  <u>Qingdao Taifa Grp. Co. v. United States</u>, 780 F. Supp.

2d 1342, 1350 (CIT 2011) (internal quotation marks omitted).  Even if Commerce's analysis

conflicts with its prior cases, "Commerce is not required to justify its determination in terms of

past alternatives," as long as it acts reasonably.  <u>Id.</u>  Timken's allegations that Commerce's

application of the test was unreasonable will be addressed below, but the court holds that

Commerce's prior practice did not preclude it from engaging in a sufficiency determination as

part of its exercise of discretionary authority.

## II.  Commerce's Alleged Failure to Explain Its Application of the Sufficiency Test

    Timken next argues that Commerce failed to explain the purpose of its additional

sufficiency test and failed to state and justify the amount of targeted sales it considers

"sufficient." Timken Br. 34–35. Because Commerce failed to provide this reasoning, Timken

argues that remand is necessary. See id. at 35.

The government explains that Commerce has discretion in deciding whether to

apply the A-T methodology even if targeting is found, that Commerce engaged in the challenged

additional step to determine whether the pattern found by the Nails test was sufficient to exercise

that discretion, and that Commerce has not established a de minimis threshold, but rather is

proceeding on a case-by-case basis in deciding when to exercise its discretion. Government Br.

11–14. The government additionally argues that Commerce's sufficiency determination in this

case was reasonable because Commerce is not obligated to justify relying on the default

comparison methodology (i.e., the A-A methodology) and Commerce's experience in conducting

the Nails test informed its judgment in making that determination. Id. at 17–18.

Schaeffler argues that Commerce enjoys broad discretion in determining whether

to apply the A-T methodology and that "[a]ny reasonable mind would accept that the minimal

number and value of Schaeffler's qualifying sales supports Commerce's conclusion that

Schaeffler had not engaged in a pattern of targeted dumping." Schaeffler Br. 10–11. Schaeffler

also argues that this additional step is necessary because Commerce could otherwise impose the

"draconian remedy" of applying the A-T methodology with zeroing to all sales even though very

few sales passed the Nails test. Id. at 15. NTN-SNR and SKF urge that an additional inquiry is

needed to determine whether the amount of sales that pass the Nails test truly can be considered

a pattern. NTN-SNR Br. 12–14; SKF Br. 23–24. SKF additionally argues that Commerce

should be given wide discretion in defining "pattern" on a case-by-case basis and should not be

required to set a specific threshold. SKF Br. 24–25

As explained above, Commerce is relying on the word "may" in the statute.  With this established, Commerce's sufficiency determination easily can be understood as a methodology by which Commerce decides whether to exercise that discretion.  If a relatively insignificant number of sales are identified as targeted, Commerce exercises its discretion and continues to apply the A-A methodology.  See I&D Memo at 13–14; Government Supplemental Br. 7.[8]  The sufficiency test thus serves as a tool to guide Commerce's exercise of its discretion in choosing whether to depart from its normal practice of using the A-A methodology.

Regarding Timken's argument that Commerce has failed to provide any explanation regarding what amount of targeted sales it considers to be "sufficient," the court has reviewed the record and has concluded that Timken did not present its arguments to Commerce

---

[8] As Schaeffler notes, the reasonableness of making a sufficiency determination would appear to be buttressed by Commerce's practice of applying the A-T methodology with zeroing to all of the respondent's sales, not just those that passed the Nails test.  See, e.g., Wood Flooring from China at 31.  Before applying this "remedy" to all of the respondent's U.S. sales, it would appear reasonable for Commerce to consider whether the amount of targeted sales forming the justification for applying that remedy represents a significant portion of the respondent's U.S. sales.

The court notes that a recent opinion of the court held that Commerce's withdrawal of the so-called "Limiting Rule," 19 C.F.R. § 351.414(f)(2) (2007), which limited the A-T remedy in investigations to only targeted sales, violated the Administrative Procedure Act, 5 U.S.C. § 553.  Gold E. Paper (Jiangsu) Co. v. United States, 918 F. Supp. 2d 1317, 1327–28 (CIT 2013).  Thus, until the amended regulation is renoticed, the A-T remedy likely should be limited to only those sales that pass the Nails test, at least in investigations.  The court observes, however, that Commerce has continued to apply the A-T methodology with zeroing to all sales in administrative reviews even after Gold East Paper, relying in part on the fact that 19 C.F.R. § 351.414(f) referenced only investigations.  See, e.g., Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Stainless Steel Plate in Coils from Belgium; 2011–2012, A-423-808, at 3 (Dec. 23, 2013), available at http://enforcement.trade.gov/frn/summary/belgium/2013-31345-1.pdf.  Should the Limiting Rule be applied to reviews, Schaeffler's arguments regarding the "draconian remedy" of applying the A-T methodology with zeroing to all sales would be rendered moot.  In any case, the sufficiency test is justified as a tool in guiding Commerce's discretionary authority based on the record now before the court.

in a manner that compelled Commerce to define a level of sufficiency with specificity.  In its

post-preliminary results, Commerce made specific findings regarding the percentage of sales by

value and by volume that passed the <u>Nails</u> test.  <u>See</u> <u>Post-Preliminary Analysis for NTN-SNR</u> at

2; <u>Post-Preliminary Analysis for myonic</u> at 2; <u>Post-Preliminary Analysis for Schaeffler</u> at 2;

<u>Post-Preliminary Analysis for SKF</u> at 2.  The court notes that by either measure, the percentages

of sales found to be targeted were very small.  <u>See</u> Timken Co.'s Mem. in Supp. of its Rule 56.2

Mot. for J. on the Agency R., ECF No. 44, 33, 40 (confidential version).  In its comments to

Commerce following the post-preliminary results, Timken challenged Commerce's decision to

engage in this additional inquiry, but Timken did not argue that the percentages found should be

considered sufficient, nor did Timken argue that Commerce erred by failing to set and justify a

specific sufficiency threshold.  <u>See</u> <u>Timken's Post-Preliminary Comments for NTN-SNR</u>;

Timken's Comments on Commerce's Targeting Analysis for Schaeffler and SKF, A-475-801,

PD 162 at bar code 3104350-01 (Nov. 5, 2012), ECF No. 47-3 (June 14, 2013) ("<u>Timken's Post-</u>

<u>Preliminary Comments for Schaeffler and SKF</u>"); Timken's Comments on Commerce's

Targeting Analysis for myonic GmbH, A-428-801, CD 39 at bar code 3104315-01 (Nov. 5,

2012), ECF No. 48 (June 14, 2013) ("<u>Timken's Post-Preliminary Comments for myonic</u>").

Because Commerce was never presented with (and consequently did not consider) arguments

asking it to specify and justify a sufficiency threshold, because Timken never argued that the

specific percentages found should be considered sufficient, and because the percentages were

small, this argument fails.

### III.   Comparison of Sales that Passed the <u>Nails</u> Test to All U.S. Sales

Finally, Timken argues that the use of the sales that passed the <u>Nails</u> test as the

numerator and all U.S. sales as the denominator in the "ratio" Commerce used in its sufficiency

determination is illogical.  Timken Br. 36–41.  First, Timken argues that because the <u>Nails</u> test

considers only products sold to an alleged target that are identical to products sold to a non-

target, the numerator and denominator used in this case were inconsistent.  <u>Id.</u> at 37–38.  Timken

reasons that products that are sold to only the targeted customer cannot be considered in

Commerce's application of the <u>Nails</u> test (because there are no non-targeted sales of the same

product to compare the prices with), and a numerator drawn from only identical sales is

inconsistent with a denominator that includes all sales.  <u>Id.</u>  Next, Timken argues that the <u>Nails</u>

test finds only evidence of targeted dumping but does not find all targeted sales.  <u>See</u> <u>id.</u> at

38–40.  According to Timken, because the <u>Nails</u> test does not identify all targeted sales, using

the results of the <u>Nails</u> test to determine the extent of targeted dumping is unreasonable.  <u>Id.</u>

Timken suggests that a more reasonable comparison would be to treat all sales to the targeted

groups identified by the <u>Nails</u> test as targeted sales, and compare that number to total U.S. sales.

<u>Id.</u> at 40.

      The government recognizes that the <u>Nails</u> test is limited to comparing sales of

identical merchandise, but it argues that Timken has not explained how using comparable

merchandise when conducting the <u>Nails</u> test would be feasible or preferable to using identical

merchandise.  Government Br. 20–21.  The government counters Timken's arguments that the

<u>Nails</u> test fails to find all targeted sales by noting that Timken has cited to nothing in the record

showing that the <u>Nails</u> test is ill-suited to evaluating the pricing patterns in this case.  <u>Id.</u> at 21.

Commerce rejected Timken's suggestion that all sales to the targeted groups be included in the

numerator by explaining that only those sales that passed the <u>Nails</u> test rightfully can be

considered "targeted."  <u>I&D Memo</u> at 14.  SKF characterizes and criticizes Timken's argument

as an attack on the ability of the <u>Nails</u> test to identify all targeted sales.  <u>See</u> SKF Br. 26–30.

      The court rejects Timken's claims of inconsistency between the numerator and

denominator based upon the <u>Nails</u> test's use of only identical merchandise, because Timken has

failed to show that this inconsistency actually exists on this record to such an extent that

Commerce's use of the ratio was unreasonable.  The court notes that Timken's arguments

regarding the ratio before Commerce never addressed the possibility that the use of only

identical sales in the numerator of the ratio while including all sales in the denominator could

create a material inconsistency affecting Commerce's interpretation of the data.  <u>See</u> <u>Timken's</u>

<u>Post-Preliminary Comments for NTN-SNR</u>; <u>Timken's Post-Preliminary Comments for</u>

<u>Schaeffler and SKF</u>; <u>Timken's Post-Preliminary Comments for myonic</u>.  Before the court,

Timken never referenced any record evidence suggesting that Commerce's use of this ratio

would be unreasonable in these particular reviews because of this alleged discrepancy until its

response to the government's and defendant-intervenors' supplemental briefs following oral

argument.  <u>See</u> Resp. to Def.'s and Def.-Intervenors' Supplemental Brs., ECF No. 86, 4 n.8.

Even this late evidence was quite meager, as it was dropped in a footnote and discussed the

potential distortion for only one of the four respondents.  <u>See</u> <u>id.</u>  Thus, Timken has failed to

challenge Commerce's determination with anything more than hypotheticals, and the court will

not disturb Commerce's determination on that basis.  <u>See</u> <u>Borden, Inc. v. United States</u>, 23 CIT

372, 379 (1999), <u>rev'd on other grounds</u>, 7 F. App'x 938 (Fed. Cir. 2001).

      Timken's argument that the <u>Nails</u> test fails to find all targeted sales and thus its

results should not be used to determine the extent of targeting, however, was presented to

Commerce.  The court nevertheless finds this argument unavailing.

Timken argues that the <u>Nails</u> test is useful only as a tool to identify whether targeting occurred, not as a tool for identifying targeted sales.  <u>See</u> Timken Br. 40.  There is nothing in the antidumping statute, however, defining a "targeted sale."  Commerce uses the <u>Nails</u> test to find a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i).  <u>See</u> <u>I&D Memo</u> at 12–13.  Commerce's use of the <u>Nails</u> test to define that pattern has been affirmed by the court as a reasonable interpretation of the statute. <u>Mid Continent Nail Corp. v. United States</u>, 712 F. Supp. 2d 1370, 1378–79 (CIT 2010) ("<u>Mid Continent Nail</u>").  Commerce treats only those sales that pass both prongs of the <u>Nails</u> test as forming the "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and consequently considers only those sales to be "targeted."  <u>I&D Memo</u> at 14.  Thus, Timken's arguments regarding the ability of the <u>Nails</u> test to uncover all targeted sales ultimately amount to an attack on the <u>Nails</u> test itself.  The court previously upheld the <u>Nails</u> test as a reasonable interpretation of the statute in <u>Mid Continent Nail</u> in the face of challenges similar to those advanced by Timken and sees no reason to depart from that decision now.  <u>See</u> 712 F. Supp. 2d at 1378–79 (rejecting claims that "Commerce's use of thirty-three percent in its 'pattern' definition and five percent in its 'differ significantly' definition are seemingly random values with no meaning" that "cause the nails test to overlook obvious targeting").

Because the <u>Nails</u> test defines what is a "targeted" sale, Commerce reasonably rejected Timken's suggestion that all sales to the targeted group(s) be included in the numerator.

The sales that did not pass the <u>Nails</u> test are by definition not part of the pattern identified pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i).  <u>I&D Memo</u> at 14.  In determining whether the identified pattern is sufficient to warrant consideration of the A-T methodology, it would make little sense for Commerce to include sales that did not form part of that pattern in the numerator of the ratio.  Commerce's decision to use only those sales that passed the <u>Nails</u> test as the numerator thus was reasonable and in accordance with law.

**CONCLUSION**

For the foregoing reasons, Commerce's <u>Final Results</u> are SUSTAINED. Judgment will issue accordingly.


                                              /s/ Jane A. Restani
                                                Jane A. Restani
                                                    Judge

Dated: February 27, 2014
          New York, New York